IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MONIQUE VANSTORY-FRAZIER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 08-3910 |
| | : | |
| CHHS HOSPITAL COMPANY, LLC, | : | |
| t/d/b/a CHESTNUT HILL HOSPITAL, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM**

YOHN, J.                                                    November 29, 2011

Plaintiff, Monique VanStory-Frazier, filed this action against CHHS Hospital Company, LLC, t/d/b/a Chestnut Hill Hospital, seeking damages and other relief for defendant's alleged violations of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201 *et seq.*, the Pennsylvania Minimum Wage Act (the "PMWA"), 43 Pa. Stat. Ann. §§ 333.101 *et seq.*, and the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601 *et seq.* In her amended complaint, plaintiff alleges that defendant violated the FLSA and the PMWA by failing to pay her overtime while she was employed as a front-desk supervisor with defendant's Chestnut Hill Family Practice. She further alleges that defendant interfered with her exercise of her rights under the FMLA by failing to restore her to the front-desk supervisor position upon her return to work after taking approved FMLA leave, and retaliated against her for taking such leave, first by transferring her to a lower-paying position upon her return and then by terminating her. Plaintiff

has filed a motion for partial summary judgment under Federal Rule of Civil Procedure 56 as to

her FLSA overtime claim. Defendant has moved for partial summary judgment as to plaintiff's

FMLA retaliatory-termination claim. For the reasons set forth below, I will deny both parties'

motions for summary judgment.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff began working for the Chestnut Hill Family Practice, one of nine medical

practices owned by defendant, in June 2006. (Pl.'s Statement of Facts in Supp. of Mot. for Partial

Summ. J. ("Pl.'s Facts") ¶ 1; Mem. of Law in Supp. of Def.'s Reply in Opp'n to the Mot. for

Partial Summ. J. of Pl. ("Def.'s Opp'n Br.") at 9.) According to defendant, Chestnut Hill Family

Practice has six attending physicians and eighteen residents at any one given time (Def.'s Opp'n

Br. at 9) and more than a dozen staff members (Pl.'s Mot. for Partial Summ. J. Ex. B, Dep. of

Kathleen Benish (June 24, 2009) ("Benish Dep.") at 13:23–15:4). Initially hired as a referral

coordinator, plaintiff was promoted to the position of payment poster in October 2006. (Pl.'s

Facts ¶¶ 2–3.) Both of these positions were hourly, "nonexempt" positions in which plaintiff was

eligible for overtime compensation.[2] (Pl.'s Mot. for Partial Summ. J. Ex. A, Dep. of Monique

VanStory-Frazier (June 23, 2009) ("Pl.'s 2009 Dep.") at 31:11–17; Benish Dep. at 17:15–18:1.)

---

[1] Except as otherwise noted, the following facts are undisputed.

[2] As discussed in greater detail below, both the FLSA and the PMWA require employers to compensate employees at a higher, overtime rate for hours worked in excess of forty in a workweek, unless the position falls into one of a number of statutory exemptions. *See* 29 U.S.C. §§ 207(a)(1), 213; 43 Pa. Stat. Ann. §§ 333.104(c), 333.105. Positions that are covered by an FLSA or a PMWA exemption are referred to as "exempt," whereas those positions that do not come within one of the statutory exemptions, and for which overtime pay is required, are referred to as "nonexempt."

In August 2007, plaintiff was again promoted, this time to the position of front-desk supervisor. (Pl.'s Facts ¶ 4.) In this position, plaintiff was reclassified as an exempt employee, and her salary was increased from $14 to $18 per hour. (Def.'s Opp'n Br. at 9; Pl.'s 2009 Dep. at 32:6–11, 56:9–57:6.) As front-desk supervisor, plaintiff acted as a liaison between the practice manager, Kathleen Benish, and the front desk, which at the time was staffed by five employees who handled patient check-in and check-out and answered the phones. (Pl.'s Facts ¶ 12; Def.'s Opp'n Br. at 10.) Plaintiff was responsible for the "smooth, efficient and appropriate functions of the office and support staff." (Pl.'s 2009 Dep. at 47:6–18.) Plaintiff also continued to have accounts-receivable duties, and was responsible for posting payments in the computer system. (*Id.* at 76:8–12, 164:20–165:4; Benish Dep. at 20:12–16, 21:8–13.) Plaintiff testified that while serving as front-desk supervisor, she worked approximately ten hours of overtime per week. (Pl.'s 2009 Dep. at 113:4–9.)

In March 2008, plaintiff submitted a request for medical leave under the FMLA. (Pl.'s Facts ¶ 16.) Benish approved the request on March 24, 2008, and plaintiff commenced her FMLA leave on April 3, 2008. (*Id.* ¶¶ 17–18.) Plaintiff returned to work on June 30, 2008, after being cleared by her physician to return. (*Id.* at ¶¶ 19–20.) Although plaintiff returned to the position of front-desk supervisor and "jumped right in and started picking up phone calls like [she] would normally do" (Pl.'s 2009 Dep. at 111:20–23), she was soon informed that her position was being eliminated. On or about July 14, 2008, plaintiff met with Benish, Jim Como, the human-resources director, and Theresa Ward, the director of physician practices, who advised her that Benish would be acting as front-desk supervisor. (*Id.* at 120:7–121:13.) They offered plaintiff a nonexempt position as an accounts-receivable representative (or "biller") at a reduced

3

pay rate of $15.37 per hour. (*Id.* at 121:14–122:6.) Plaintiff accepted the position and began

working for defendant as a biller. (*Id.* at 120:24–122:15.)

Plaintiff testified, however, that even though she had not previously performed the job of

biller, and even though Benish had always said that "training is essential for any position," she

did not receive training for her new position. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for

Partial Summ. J. Ex. C, Dep. of Monique VanStory-Frazier (Aug. 10, 2011) ("Pl.'s 2011 Dep.")

at 14:10–14; Pl.'s 2009 Dep. at 129:3–5.) According to plaintiff, when she asked for training,

Benish sent her an e-mail instructing her to "go online and teach [herself]" and to ask a coworker

if she had any questions. (Pl.'s 2011 Dep. at 14:16–22.) Plaintiff testified that she "was the only

person that [she] kn[e]w of who was never trained for that position." (*Id.* at 19:17–18.)

Plaintiff filed this action on August 18, 2008, about a month after she was moved to the

position of biller. She claimed that defendant had improperly classified the position of front-desk

supervisor as exempt, and had failed to pay her overtime wages while she served as front-desk

supervisor, in violation of the FLSA and the PMWA (counts I and II). She also asserted claims

for interference and retaliation under the FMLA stemming from defendant's failure to restore her

to her former position upon her return from FMLA leave and to instead transfer her to a lower-

paying position (counts III and IV). After discovery, defendant filed a motion for partial summary

judgment as to plaintiff's FLSA and PMWA overtime claims, as well as her FMLA interference

claim, which I denied in a memorandum and order dated January 4, 2010.

Meanwhile, plaintiff continued to work at the Chestnut Hill Family Practice. But on

August 28, 2009, while its motion for partial summary judgment was pending, defendant

terminated plaintiff.

Plaintiff testified that the day before she was terminated, Benish told her to work at the front desk. According to plaintiff, when she asked Benish why she was being told to work at the front desk, given that Benish had previously told her that she should not be at the front desk because she did not have good customer-service skills, Benish told her to "do what I say." (Pl.'s 2011 Dep. at 8:6–25.) Plaintiff testified that she worked at the front desk without any problems, but that sometime in the afternoon she was called to Como's office. (*Id.* at 9:7–23.) Benish, Como, and John Clarkin, a human-resources generalist, were there, and Clarkin allegedly told her that "whatever we tell you to do you better do, and [Benish is] your boss so you better listen." (*Id.* at 9:24–10:11.) According to plaintiff, she told them that she "felt that [she] was being harassed, and that [she] didn't want to be harassed any longer." (*Id.* at 11:13–18.) She asked, "[W]hy do you keep listening to this person, because I haven't done anything wrong." (*Id.* at 11:18–21.) Plaintiff testified that Clarkin yelled at her, saying, "[I]f I have a boss I'm going to do what I'm told, and you better do what you're told." (*Id.* at 11:22–12:4.)

The next morning (the day that plaintiff was fired), plaintiff was approached by Benish and Diane Holder, the billing manager, regarding the voiding of payments. (Mem. of Law in Supp. of Def.'s Mot. for Partial Summ. J. ("Def.'s Br.") at 5; Pl.'s 2011 Dep. at 19:2–7.) According to plaintiff, she told them that she was not voiding checks and that she "follow[ed] exactly what [she] was told." (Pl.'s 2011 Dep. at 19:7–8.) She further explained to them that "since [she] was never trained, [she] would always call athena [the billing organization (*see* Benish Dep. at 74:7–10)] to get specific instructions on what [she] was to do on each and every claim." (*Id.* at 19:8–11.)

Benish, on the other hand, in a written account of the meeting, said that plaintiff "was

defensive, rigid and rude" and that she "exhibited very unprofessional behavior in her demeanor, tone, through her entire interaction with [Holder]." Benish claimed that plaintiff "did not allow [Holder] any time to fully explain [the problem]," asserting that plaintiff "kept interrupting, displaying a push back attitude." According to Benish, Holder was "verbally attacked" by plaintiff. (Def.'s Mot. for Partial Summ. J. Ex. C (statement of Kathleen Benish).)

Similarly, in her written account of the meeting, Holder claimed that plaintiff's behavior "was hostile, verbally rough, and defensive." Holder stated that she contacted Ward and the human-resources department after the meeting to report plaintiff's behavior. (*Id.* Ex. C (statement of Diane Holder).)

In her written account of the day's events, Ward said that after Holder informed her about the meeting, she (Ward) met with Clarkin and Como, and they decided to issue a written warning to plaintiff and to suspend her for a day and a half. (*Id.* Ex. E (statement of Theresa Ward) at 1.)

Again, the parties' accounts of what happened next differ.

According to Ward, that afternoon she and Clarkin called plaintiff into Benish's office for a "counseling session" and to inform her that she was being suspended (Benish was not there). Clarkin reportedly said that human resources had received a complaint from Holder about plaintiff's behavior, at which point plaintiff "abruptly got up, opened the office door, walked out to her desk and started to quickly look into her pocketbook." Ward told her that "this was inappropriate, and that she needed to return to the office." But plaintiff reportedly stated, "'No, no, I will be with you,' as she held up her hand to [Ward]." Plaintiff then grabbed her cell phone and walked away. When plaintiff returned to the office, Ward told her that her "abrupt exit was completely inappropriate." According to Ward, plaintiff responded by shouting, "No, no, it was

6

not, this is harassment," as she "wav[ed] her hand vigorously back and forth." After Clarkin and

Ward said that plaintiff could be viewed as harassing *them*, plaintiff reportedly "jumped up from

her chair, waving her hand back and forth, started to scream[,] '[T]his is harassment, and I am

done!' and left the office again." She said, "[I]f you are going to fire me, fire me! Whatever you

are going to do to me do it, I am done! I want something in writing though." Clarkin "stated that

[plaintiff] would not receive something in writing." According to Ward, plaintiff returned to her

desk and "continued to yell." When Ward told plaintiff that she "needed to calm down and lower

her voice as she was disrupting the office and patients," plaintiff yelled, "'No! I am not going to

stop. I don't care anymore who hears me! I am done! I am not going to let HR harass me

anymore! You all believe Kat [Benish], you all think that Kat is right, no, no! I am done! You

will get yours! The law is on my side!'" At that point Ward asked Clarkin whether they should

call security. Plaintiff then "started to yell, '[G]o ahead, call security, I am going to call security

on you! You are harassing me. I am going to call the police,'" and began gathering items from

her desk. (*Id.* at 1–2.)

Plaintiff, on the other hand, testified that after she was called into the meeting with Ward

and Clarkin, she said, "[O]h, excuse me, please, one moment, I need to make a call." (Pl.'s 2011

Dep. at 40:23–41.1.) She testified that she did not wait for a response but "just jumped up

because [she] didn't want any drama" and "went to the bathroom . . . [to] call [her] attorney's

office" (*id.* at 42:14–43:3) to tell her attorney that she "felt that she was being harassed again"

(*id.* at 20:3–7). She testified that when she returned, Clarkin "started banging on the desk,"

saying, "[W]ho do you think you are, nobody told you to leave." (*Id.* at 20:9–14.) According to

plaintiff, Clarkin was "screaming and acting inappropriately." (*Id.* at 44:8–15.) Ward,

meanwhile, "kept saying, you're just so inappropriate." (*Id.* at 20:15–20.) According to plaintiff, she "opened the door and said, [N]o more harassment. No more harassment." (*Id.* at 20:21–22.) In response, Clarkin banged on the desk and said, "[G]et back here." (*Id.* at 20:22–24.) Plaintiff replied that she was not going to talk to him behind a closed door. Clarkin then started yelling, "[G]et out, get out, get out." (*Id.* at 20:24–21:1.) Plaintiff testified that she asked whether she could have something in writing, to which Clarkin replied, "I'm not giving you nothing." (*Id.* at 21:2–4.) Plaintiff then went back to her desk, collected her things, and left. (*Id.* at 47:12–50:5.)

Plaintiff was terminated after that meeting (although plaintiff testified that she believed that she was terminated at that meeting, when Clarkin told her to "get out" (*id.* at 45:17–23, 50:6–13)). According to the termination letter prepared by defendant, she was terminated because of her "[i]nsubordination"; "[o]utbursts of anger"; "[d]eliberate failure to adhere to organizational policies without adequate evidence to support the alternatives chosen"; "[i]nappropriate responses, language or behaviors"; and "[e]xhibit[ion] [of] behaviors that affect others' working environments." (Def.'s Mot. for Partial Summ. J. Ex. F (termination letter), at 2.)

Thereafter, plaintiff sought to assert new claims relating to her termination, and the parties agreed that it would be more efficient to litigate all of plaintiff's claims together. Accordingly, I stayed the action. On February 1, 2011, plaintiff sought leave to file an amended complaint to assert facts regarding her termination in further support of her FMLA retaliation claim, which I granted on March 3, 2011. After conducting additional discovery, the parties have now filed motions for partial summary judgment. Plaintiff seeks partial summary judgment as to her FLSA overtime claim, and defendant seeks partial summary judgment as to plaintiff's FMLA

retaliatory-termination claim.

## II.   STANDARD OF REVIEW

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The moving party bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, to defeat a motion for summary judgment, the nonmoving party must present "specific facts showing that there is a *genuine issue for trial*," *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted), offering concrete evidence supporting each essential element of its claim, *see Celotex*, 477 U.S. at 322–23. The nonmoving party must show more than "[t]he mere existence of a scintilla of evidence" for elements on which it bears the burden of production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

When evaluating a motion for summary judgment, the court "is not to weigh the evidence or make credibility determinations." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). "The evidence of the nonmovant is to be believed, and all

justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (internal quotation marks omitted). "[A]n inference based upon a speculation or conjecture," however, "does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## III.     DISCUSSION

### A.     FLSA Overtime Claim

Subject to various exemptions, the FLSA requires employers to compensate employees "at a rate not less than one and one-half times the [employee's] regular rate" for hours worked in excess of forty in a given workweek. 29 U.S.C. § 207(a)(1). This obligation to pay overtime wages does not apply, however, with respect to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).

Plaintiff claims that while serving as front-desk supervisor she worked overtime and that she was entitled to overtime pay under the FLSA. Defendant contends that plaintiff's position as a front-desk supervisor was properly classified as "exempt" under both the "executive" and "administrative" exemptions referenced in 29 U.S.C. § 213(a)(1) and that it thus had no obligation to pay plaintiff overtime wages.

"FLSA exemptions should be construed narrowly, that is, against the employer." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). "The burden of proving

these exemptions is upon the employer, and if the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991). Plaintiff contends that she is entitled to summary judgment as to her FLSA overtime claim because defendant cannot satisfy its burden of proving that she "comes 'plainly and unmistakably' within the exemption's terms." *Lawrence*, 527 F.3d at 310 (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

As a preliminary matter, I note that the mere fact that I previously denied defendant's motion for summary judgment as to plaintiff's overtime claims does not necessarily mean that plaintiff is now entitled to summary judgment as to those claims, because plaintiff "must still establish that no genuine issue of material fact exists and that [she] is entitled to judgment as a matter of law." *Atl. Used Auto Parts v. City of Philadelphia*, 957 F. Supp. 622, 626 (E.D. Pa. 1997).

In my prior opinion denying defendant's motion for summary judgment, I not only concluded that defendant had not met its burden of establishing undisputed facts that would compel a reasonable juror to find that plaintiff's front-desk position falls within the FLSA's executive exemption, but I also further asserted that "the evidence presented may well lead to a conclusion that no reasonable juror could find that the position falls within the [executive] exemption." *VanStory-Frazier v. CHHS Hospital Co.*, No. 08-3910, 2010 WL 22770, at *6 n.8 (E.D. Pa. Jan. 4, 2010). Nonetheless, because there is a genuine dispute of material fact regarding defendant's assertion that plaintiff's position as a front-desk supervisor falls within the *administrative* exemption, I will deny plaintiff's motion for summary judgment as to her overtime claim.

Under the FLSA, an "employee employed in a bona fide administrative capacity" is an employee (1) who is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week . . . , exclusive of board, lodging or other facilities"; (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

Plaintiff does not contest that her compensation arrangement met the salary prong of the administrative exemption. (Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Pl.'s Br.") at 7 n.2.) But plaintiff contends that defendant has failed to meet its burden of establishing both that her primary duty was the performance of "administrative work" and that her primary duty included the exercise of discretion and independent judgment with respect to matters of significance.

Plaintiff contends first that defendant has failed to meet its burden of demonstrating that her primary duty as front-desk supervisor was the performance of "work directly related to the management or general business operations." The regulations explain that "work directly related to management or general business operations" includes, among other things, "work in functional areas such as . . . personnel management." 29 C.F.R. § 541.201(b). Similarly, the regulations define "management," for purposes of the executive exemption, to include activities such as training employees, directing their work, appraising their productivity and efficiency for the purpose of recommending promotions or other changes in status, and disciplining employees. *See id.* § 541.102. Accordingly, courts have held that supervising and training staff are the types of

12

duties encompassed by the administrative exemption. *See, e.g.*, *McKinney v. United Stor-All Ctrs. LLC*, No. 08-0333, 2009 WL 3008080, at *6 (D.D.C. Sept. 21, 2009).

Plaintiff concedes that her duties as front-desk supervisor "included some tasks that could be considered administrative work." (Pl.'s Br. at 7.) Indeed, as I discussed in my prior opinion, there is ample evidence that plaintiff's job responsibilities included the type of work that is encompassed by the administrative exemption.

Plaintiff's testimony suggests, for example, that she engaged in supervisory tasks—she testified that she was expected to make sure "that patients were being received well by the staff"; that staff members "were using appropriate phone language, appropriate gestures at the front desk"; that those employees "who were supposed to be answering the phone, [were] answering the phones"; that "those who were supposed to be checking in [patients], [were] checking in, not reading, not doing other things"; that "the check out person [was] taking in the encounter forms as patients were finished being seen by the doctors"; and "that that person [was] entering the charges." (Pl.'s 2009 Dep. at 48:1–12.)

Plaintiff testified that because the practice was short staffed at the time, she also "ended up doing check in and answering the phones." (*Id.* at 40:16–22). But she further testified that she primarily handled the emergency lines, "supervisory issues," and any problems with patients. (*Id.* at 40:22—41:2.) She explained that to help the front desk run more smoothly, she elected to "pick up the doctors' lines, emergency lines, because those were the calls that for the most part had to run back and forth with triage." (*Id.* at 54:13–19; *see also id.* at 40:22–23.) She also instructed the front-desk staff to send "problem calls" to her so that the phone system would not get overloaded. (*Id.* at 49:10–52:8.)

Plaintiff also testified that she oversaw financial closing procedures at the end of the day, making sure that the front-desk staff accurately counted money received from patients, took it to the business office, and applied the funds to the correct account. (*Id.* at 40:1–9.)

Although plaintiff testified that as front-desk supervisor she was not involved in scheduling front-desk employees (*id.* at 42:14–17), she also testified that front-desk employees submitted their requests for time off to her and that she had the authority to grant or deny their requests (*id.* at 145:11–46:10).

According to Benish, plaintiff had the authority to conduct performance reviews of front-desk employees (Benish Dep. at 18:14–17), although plaintiff testified that she did not actually complete any performance reviews of front-desk employees—according to plaintiff, she only completed "rounding reports," which were different from performance reviews (Pl.'s 2009 Dep. at 44:3–7). Plaintiff explained that a rounding report was "just a little synopsis of how [employees are] doing at the front, what they're doing, if there are any issues that need to be addressed." (*Id.* at 44:10–13.)

Benish also testified that plaintiff had the authority to participate in the hiring and firing process (Benish Dep. at 18:18–19:2), although plaintiff denied having any ability to make recommendations regarding the hiring or termination of front-desk employees (Pl.'s 2009 Dep. at 45:17–21).

Moreover, although plaintiff testified that she did not have the ability to discipline front-desk employees (*id.* at 42:22–24), she did address performance issues with employees on occasion, reminding one chronically late employee, for example, that it was important for her to arrive on time (*id.* at 68:22–69:4) and reminding employees who failed to use the correct forms

14

and phone protocols to follow the appropriate procedures (*id.* at 53:12–19). And Benish similarly testified that plaintiff had the authority to discipline front-desk employees, although she said that any disciplinary actions taken by plaintiff required her approval as department head. (Benish Dep. at 19:13–20:8.)

Plaintiff contends, however, that such administrative work was not her "primary duty." She asserts that she also performed "many tasks that must be considered clerical work" (Pl.'s Br. at 7), such as answering the phones and assisting with patient check-in, as well as continuing to perform her former duty of posting payments in the computer system.

Plaintiff argues that section 213(a)(1) of the FLSA requires that an employee devote at least 60 percent of her time to administrative activities in order for her position to be classified as exempt. And, pointing to the testimony of Benish, who assumed plaintiff's administrative duties after her position of front-desk supervisor was eliminated, plaintiff contends that she devoted less than 60 percent of her time to administrative activities: Benish testified that plaintiff's former administrative duties added, on average, only two to three hours to her workday (Benish Dep. at 56:5–58:7).

Plaintiff, however, has misinterpreted section 213(a)(1). That section provides, in relevant part, that

> an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities.

29 U.S.C. § 213(a)(1). That is, section 213(a)(1) provides that an employee who performs both

15

administrative and non-administrative duties may not be excluded from the definition of an

exempt administrative employee because of the number of hours she devotes to non-

administrative activities, if she devotes less than 40 percent of her time to non-administrative

activities. Contrary to plaintiff's contention, however, this provision does *not* require that an

employee devote more than 60 percent of her time to administrative activities in order to be

classified as an exempt administrative employee. *See Soehnle v. Hess Corp.*, 399 F. App'x 749,

751 n.3 (3d Cir. 2010) (not precedential) (rejecting plaintiff's claim that "§ 213(a)(1) requires an

employee to spend a minimum of 60% of her time on managerial duties to qualify for the

overtime exemption," and asserting that "§ 213(a)(1) requires a qualitative evaluation," not a

quantitative one).

Indeed, the regulations explain that, although the amount of time spent performing

exempt work "can be a useful guide in determining whether exempt work is the primary duty of

an employee[,] . . . [t]ime alone . . . is not the sole test." 29 C.F.R. § 541.700(b). Rather, under

the regulations, an employee's "primary duty" is "the principal, main, major or most important

duty that the employee performs." 29 C.F.R. § 541.700(a). And the regulations further provide

that the "[d]etermination of an employee's primary duty must be based on all the facts in a

particular case, with the major emphasis on the character of the employee's job as a whole." *Id.*

Relevant factors include "the relative importance of the exempt duties as compared with other

types of duties; the amount of time spent performing exempt work; the employee's relative

freedom from direct supervision; and the relationship between the employee's salary and the

wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

Thus, the regulations explain that employees who spend less than 50 percent of their time

performing exempt duties "may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.* § 541.700(b).

The parties do not address the factors specified in the regulation, and the record contains little evidence as to any of them. There is thus not enough evidence at this stage to determine whether, as a matter of law, "administrative" work was plaintiff's "primary duty."

Plaintiff next contends that defendant has failed to meet its burden of establishing that her primary duty included the exercise of discretion and independent judgment with respect to matters of significance. "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* § 541.202(a). Factors relevant to whether a particular employee exercises discretion and independent judgment with respect to matters of significance include the following:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b). An employee may exercise discretion and independent judgment "even if [her]

17

decisions or recommendations are reviewed at a higher level." *Id.* § 541.202(c). Indeed, "[t]he

decisions made as a result of the exercise of discretion and independent judgment may consist of

recommendations for action rather than the actual taking of action." *Id.* And "[t]he fact that an

employee's decision may be subject to review and that upon occasion the decisions are revised or

reversed after review does not mean that the employee is not exercising discretion and

independent judgment." *Id.*

      Defendant contends that plaintiff "exercised discretion and independent judgment in her

everyday duties by supervising five (5) front desk employees." (Def.'s Opp'n Br. at 16.)

Defendant asserts, for example, that front-desk employees were required to submit their requests

for time off to plaintiff and that it was plaintiff who decided whether to grant or deny their

requests. (*See* Pl.'s 2009 Dep. at 145:11–46:10.) Defendant further asserts that as front-desk

supervisor, plaintiff had the authority to develop policies regarding front-desk operations.

Defendant points to plaintiff's testimony that, at least for the first several months after she was

promoted to front-desk supervisor, she held monthly meetings in which she spoke with the front-

desk staff about the policies they were to follow (*id.* at 52:9–53:8), as well as her testimony that

she changed the practice's sign-in form in order to comply with applicable law and instructed the

front-desk staff to use the new form (*id.* at 48:17–49:9) and that she gave the front-desk staff

specific instructions on how to handle problem calls (*id.* at 49:10–51:23).[3]

---

[3] Of course, as I suggested in my prior opinion denying defendant's motion for summary judgment, there is at least some question as to whether plaintiff's development of such "policies" involved the exercise of discretion and independent judgment *with respect to matters of significance*. *See VanStory-Frazier*, 2010 WL 22770, at *8 (questioning whether "plaintiff's implementation of these measures shows that she had 'authority to . . . implement . . . operating practices' for front-desk staff within the meaning of the regulation").

Defendant also points to plaintiff's authority to discipline front-desk employees and to participate in the hiring and firing process. In my prior opinion denying defendant's motion for summary judgment, I asserted that defendant's reliance on plaintiff's authority to participate in such activities was misplaced because plaintiff had testified that she did not have such authority. Here, however, in connection with plaintiff's motion for summary judgment, the evidence of defendant is to be believed and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 255. Kathleen Benish, the practice manager, testified that plaintiff had the authority to discipline front-desk employees, although she said that any disciplinary actions taken by plaintiff required her approval as department head. (Benish Dep. at 19:13–20:8.) And although plaintiff initially testified that she did not have the ability to discipline front-desk employees (Pl.'s 2009 Dep. at 42:22–24), she later testified that she did address performance issues with employees on occasion, reminding one chronically late employee, for example, that it was important for her to arrive on time (*id.* at 68:22–69:4) and reminding employees who failed to use the correct forms and phone protocols to follow the appropriate procedures (*id.* at 53:12–19). Similarly, although plaintiff denied having any ability to make recommendations regarding the hiring or termination of front-desk employees (*id.* at 45:17–21), Benish testified that plaintiff had the authority to participate in the hiring and firing process (Benish Dep. at 18:18–19:2).

Finally, defendant notes that plaintiff participated in at least a few monthly management meetings with Benish and Dina Baker, who managed the clinical department. (Pl.'s 2009 Dep. at 28:7–22, 44:14–21.) These meetings, according to plaintiff, focused on things like problems related to the transition from one computer system to another and patient issues. (*Id.* at

44:22–45:16.)

Although it is a close question, viewing the evidence in the light most favorable to defendant, as I must in connection with plaintiff's motion for summary judgment, I conclude that defendant has pointed to sufficient evidence to establish a genuine question of fact as to whether plaintiff's responsibilities included the exercise of discretion and independent judgment with respect to matters of significance. Of course, it is not sufficient for defendant to demonstrate that plaintiff exercised discretion and independent judgment. To satisfy its burden of proving that plaintiff's position as front-desk supervisor falls within the administrative exemption, defendant must also demonstrate that it was part of plaintiff's "primary duty" to exercise such discretion and independent judgment. As discussed above, however, there is not enough evidence in the record at this stage to determine plaintiff's primary duty.

Because at this stage I cannot conclude, as a matter of law, that plaintiff's position as front-desk supervisor was improperly classified as exempt, I will deny plaintiff's motion for partial summary judgment.

### B.     FMLA Retaliatory-Termination Claim

"The FMLA grants eligible employees the right to take up to twelve workweeks of leave in any twelve-month period if a 'serious health condition . . . makes the employee unable to perform the functions of the position of such employee.'" *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007) (quoting 29 U.S.C. § 2612(a)(1)(D)). And upon returning from a qualified absence under the FMLA, an employee is entitled to be restored to his or her former position, or to an "equivalent position." 29 U.S.C. § 2614(a)(1).

20

To protect these substantive rights, the FMLA prohibits an employer from engaging in certain acts. *See Conoshenti v. Pub. Serv. Electric & Gas Co.*, 364 F.3d 135, 141 (3d Cir. 2004). The statute makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). The statute also makes it unlawful for an employer to discharge or otherwise discriminate against an individual "for opposing any practice made unlawful by [the FMLA]," 29 U.S.C. § 2615(a)(2), or to discharge or otherwise discriminate against an individual because he or she "(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to [the FMLA]; (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under [the FMLA]; or (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under [the FMLA]," 29 U.S.C. § 2615(b). The regulations state that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c).

Plaintiff has asserted both interference and retaliation claims against defendant, although only plaintiff's retaliation claims are at issue here. In particular, plaintiff contends that defendant retaliated against her first by eliminating her position as front-desk supervisor upon her return from FMLA leave and moving her to a different position with a lower rate of pay and then by terminating her. Defendant has moved for summary judgment, but only with respect to plaintiff's retaliatory-termination claim.[4]

_____

[4] Defendant previously filed a motion for summary judgment with respect to plaintiff's interference claim, which I denied in my January 4, 2010, memorandum and order. Defendant has not sought summary judgment with respect to plaintiff's claim that defendant retaliated

Courts generally analyze FMLA retaliation claims such as this one under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Potenza v. City of New York*, 365 F.3d 165, 167–68 (2d Cir. 2004) (per curiam); *accord Adams v. Fayette Home Care & Hospice*, No. 11-1020, 2011 WL 5822702 (3d Cir. Nov. 18, 2011) (not precedential). Under this framework, a plaintiff must first establish a prima facie case of retaliation under the FMLA; to do so, she must show that (1) she took FMLA leave or engaged in other protected activity under the FMLA; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to her leave or other protected activity. *See Conoshenti*, 364 F.3d at 146. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse action. *See Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). "The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse action]; the defendant need not prove that the articulated reason actually motivated the [action]." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997). Finally, if the defendant articulates such a reason, "the plaintiff must be able to convince the factfinder both that the [defendant's] proffered explanation was false, and that retaliation was the real reason for the adverse . . . action." *Moore*, 461 F.3d at 342 (internal quotation marks omitted). Although the burden of production shifts, "[t]he ultimate burden of persuading the trier of fact that the defendant [retaliated] against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Defendant argues that it is entitled to summary judgment on plaintiff's retaliatory-

---

against her by transferring her to a lower-paying position.

termination claim because plaintiff cannot demonstrate a causal connection between her

termination and her FMLA leave or subsequent lawsuit, and thus cannot establish a prima facie

case of retaliation, and because even if she could, defendant would have terminated her for

reasons unrelated to her FMLA protected activity.

Defendant contends that plaintiff's termination "had absolutely nothing to do with her

taking FMLA leave." (Mem. of Law in Supp. of Def.'s Mot. for Partial Summ. J. ("Def.'s Br.")

at 9.) "To the contrary," defendant asserts, plaintiff "was terminated because of her

insubordination; job abandonment; outburst of anger; inappropriate responses, language and

behavior, exhibiting behaviors that affect other's working environments; and deliberate failure to

adhere to organizational policies without adequate evidence to support the alternative chosen."

(*Id.*) Defendant maintains that "[plaintiff's] actions, and her actions alone, on August 28, 2009

precipitated her termination." (*Id.* at 10.)

Where, as here, the defendant has met its burden of production and has asserted a

legitimate, nonretaliatory reason for the challenged action, the question whether the employee

has made out a prima facie case "is no longer relevant." *U.S. Postal Serv. Bd. of Governors v.

Aikens*, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be

required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff

really did so is no longer relevant."); *see also Brady v. Office of the Sergeant at Arms*, 520 F.3d

490, 493–94 (D.C. Cir. 2008); *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 764 (3d Cir. 1989).

Rather, the relevant question is whether the plaintiff can "convince the factfinder both that the

[defendant's] proffered explanation was false, and that retaliation was the real reason for the

adverse . . . action." *Moore*, 461 F.3d at 342.[5] And to defeat summary judgment in such a case,

"the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that

an invidious [retaliatory] reason was more likely than not a . . . determinative cause of the

employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).[6] "To discredit the

employer's proffered reason, . . . the plaintiff . . . . must demonstrate such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

---

[5] Nonetheless, the Third Circuit has, on occasion, found it "instructive" to address whether the plaintiff demonstrated the causal connection required to establish a prima facie case, even though the court recognized that such an inquiry was unnecessary and that the relevant inquiry was whether there was sufficient evidence to support the ultimate conclusion that the challenged action was retaliatory in nature. *See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 301 n.13 (3d Cir. 2007). Here, however, because the same evidence is relevant both in supporting the inference of causation required for plaintiff's prima facie case and in casting doubt on defendant's proffered reason for terminating plaintiff, *see Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–86 (3d Cir. 2000) (asserting that a plaintiff can establish the required causal connection not just through temporal proximity or a pattern of antagonism but also through other circumstantial evidence, and recognizing that evidence supporting the prima facie case may often be helpful at the pretext stage), I find it unnecessary to separately address whether plaintiff has established a prima facie case.

[6] In *Fuentes*, a Title VII discrimination case, the Third Circuit asserted that a plaintiff could defeat summary judgment by pointing to evidence "from which a factfinder could reasonably . . . believe that an invidious discriminatory reason was more likely than not a *motivating* or determinative cause of the employer's action." 32 F.3d at 764 (emphasis added). But the Third Circuit has since held that the "motivating factor" standard does not apply to Title VII retaliation cases, *see Woodson*, 109 F.3d at 931–35, or to Title VII pretext cases, *see Watson v. SEPTA*, 207 F.3d 207, 213–220 (3d Cir. 2000). Although the Third Circuit has not expressly addressed the question of the proper standard for FMLA cases, courts have generally applied the reasoning of these Title VII cases to cases brought under the FMLA. *See generally* Model Civil Jury Instructions for the District Courts of the Third Circuit §§ 10.1.3, 10.1.4 (2011 ed.). In any event, regardless of the standard that applies, I conclude that plaintiff has proffered sufficient evidence to survive summary judgment.

of credence and hence infer that the employer did not act for the asserted [nonretaliatory] reasons." *Id.* at 765. Because I conclude that plaintiff has presented sufficient evidence to establish a genuine issue of fact as to defendant's reason for terminating her, I will deny defendant's motion for summary judgment as to this retaliatory-termination claim.

Defendant claims that plaintiff's actions on August 28, 2009, "and her actions alone" (Def.'s Br. at 10), led to her termination. But the parties' accounts of what happened that day differ materially.

According to Ward's account, for example, plaintiff abruptly left the meeting with Clarkin and Ward, and when plaintiff returned and Ward told her that her abrupt exit was inappropriate, plaintiff began to shout about being harassed. Plaintiff continued to yell and scream after she returned to her desk, disrupting the office and patients. (Def.'s Mot. for Partial Summ. J. Ex. E at 1–2.)

According to plaintiff's account, on the other hand, plaintiff excused herself from the meeting to call her attorney, and when she returned, Clarkin started banging on the desk and screaming and "acting inappropriately," saying "who do you think you are, nobody told you to leave." (Pl.'s 2011 Dep. at 20:3–14, 42:7–44:15.) When plaintiff opened the door and said, "No more harassment," Clarkin banged on the desk and said, "[G]et back here." According to plaintiff, she said that she was not going to talk to him behind a closed door, at which point Clarkin started yelling, "[G]et out, get out, get out." (*Id.* at 20:21–21:2.) According to plaintiff, it was Clarkin who was acting inappropriately, not her.

This factual dispute as to the events leading to plaintiff's termination is sufficient to establish a factual issue regarding defendant's reason for terminating plaintiff.

25

Moreover, plaintiff alleges other retaliatory acts and a pattern of antagonism beginning with the elimination of her position as front-desk supervisor and her transfer to a different position with a lower rate of pay upon her return from FMLA leave and culminating in her termination. Plaintiff testified, for example, that she did not receive any training for her new position (Pl.'s 2011 Dep. at 14:10–22); that she was the only employee in her office that did not receive a raise in 2009 (*id.* at 15:2–11); that she received an employee disciplinary action notice for excessive absenteeism, even though, according to plaintiff, she did not have excessive absences (Pl.'s 2009 Dep. at 132:2–8, 133:5–13, 151:3–152:23); that her 2009 performance review stated that she "had a problem with management and the doctors," even though, according to plaintiff, she "really had no conversation with the doctors," and that when plaintiff pointed that out to Clarkin, he told her to "be quiet, if you don't like it file an appeal" (Pl.'s 2011 Dep. at 15:18–16:14); and that after she requested FMLA leave, Benish treated her differently and that when she returned from FMLA leave, Benish "wasn't really talking to [her]" and their working relationship "was not good" (Pl.'s 2009 Dep. at 93:12–94:4, 128:17–129:1).[7]

And plaintiff testified that the day before she was terminated, Benish told her to work at the front desk, even though Benish had previously said that she should not be at the front desk because she lacked good customer-service skills. (Pl.'s 2011 Dep. at 8:6–25.) According to plaintiff, although she worked at the front desk that day without any problems, she was called

---

[7] While plaintiff alleged in her amended complaint that defendant retaliated against her by moving her from the position of front-desk supervisor to a lower-paying position and by failing to train her for that new position (*see* 1st Am. Compl. ¶¶ 61–62), she did not allege that this other conduct constituted unlawful retaliation (although plaintiff did testify at her deposition that she believed that these other instances of what she termed "harassment" were retaliatory (*see* Pl.'s 2011 Dep. at 13:13–25; Pl.'s 2009 Dep. at 128:8–12, 160:1–161:11).)

into Como's office that afternoon, and Clarkin allegedly told her that "whatever we tell you to do you better do, and [Benish is] your boss so you better listen." (*Id.* at 9:24–10:11.) According to plaintiff, when she said that she had not done anything wrong and that she thought that she was being harassed, Clarkin yelled at her, saying, "[I]f I have a boss I'm going to do what I'm told, and you better do what you're told." (*Id.* at 11:13–12:4.)

As the Third Circuit has asserted, just as "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance," a retaliation analysis "must concentrate not on individual incidents, but on the overall scenario." *Shaner v. Synthes (USA)*, 204 F.3d 494, 503 n.9 (3d Cir. 2000) (internal quotation marks and citation omitted). And this evidence, taken as a whole and viewed in the light most favorable to plaintiff, could suggest a retaliatory motive for plaintiff's termination.[8] A jury could conclude, for example, that defendant tried to induce plaintiff's insubordination or to manufacture other reasons for terminating her, or that defendant

---

[8] Although defendant does not seek summary judgment as to plaintiff's retaliation claims stemming from her transfer to a lower-paying position and defendant's failure to train her for that position, in arguing for summary judgment as to plaintiff's retaliatory-termination claim, defendant has not even addressed these other alleged acts of retaliation or plaintiff's testimony that defendant engaged in a pattern of harassment.

But even to the extent that defendant has an innocent explanation for these other acts—Ward testified, for example, that plaintiff did not receive a raise because she did not complete her compliance training (Def.'s Opp'n Br. Ex. B, Dep. of Theresa Ward (July 28, 2009) at 83:17–88:9)—I am mindful of the Eleventh Circuit's admonition, in the context of a hostile-work-environment claim, that "[w]hat may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents." *Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1510 (11th Cir. 1989), *abrogated on other grounds by Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *see also Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 285 (3d Cir. 2001) ("In determining the appropriateness of summary judgment, [a] court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury . . . would be entitled to view the evidence as a whole." ((internal quotation marks and citation omitted)).

tried to induce plaintiff to leave voluntarily. *See, e.g.*, *Woodson*, at 924 (asserting that "[t]he jury might reasonably have concluded that [defendant] engaged in a pattern of antagonistic behavior against [plaintiff] after his complaints, setting him up to fail . . . and then terminating him through a 'sham' ranking procedure"); *Jalil v. Avdel Corp.*, 873 F.2d 701, 709 (3d Cir. 1989) (asserting that the evidence "could permit the inference . . . that [defendant] was harassing [plaintiff], trying to induce his insubordination to have a pretext for firing him").

Accordingly, I will deny defendant's motion for summary judgment as to plaintiff's retaliatory-termination claim.

## III.   CONCLUSION

For the reasons set forth above, I will deny both parties' motions for partial summary judgment. An appropriate order accompanies this memorandum.